Vince M. Verde, CA Bar No. 202472
vince.verde@ogletree.com
Hailey A. Tull, CA Bar No. 357358
hailey.tull@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Park Tower, Fifteenth Floor
695 Town Center Drive
Costa Mesa, CA 92626
Telephone:  714.800.7900

Justin A. Allen, IN Bar No. 31204-49
justin.allen@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
300 N. Meridian St., Suite 2700
Indianapolis, IN 46202
Telephone:  317.916-2533

Attorneys for Plaintiff
ASSUREDPARTNERS OF CALIFORNIA
INSURANCE SERVICES, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASSUREDPARTNERS OF CALIFORNIA INSURANCE SERVICES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> KEVIN REED; RAMON FUENTES; ALEXANDRA GHICA-OCHOA; ATIF AWAN; IRIS DELA TORRE; and THE LIBERTY COMPANY INSURANCE BROKERS, LLC, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES** |

Plaintiff AssuredPartners of California Insurance Services, LLC, ("AssuredPartners"), for its Complaint for Injunctive Relief and Damages against Defendants Kevin Reed, Raymond Fuentes, Alexandra Ghica-Ochoa, Atif Awan, and Iris Dela Torre, (collectively, the "Individual Defendants"), and The Liberty Company Insurance Brokers, LLC ("Liberty") (altogether the "Defendants"), alleges as follows.

1

COMPLAINT FOR INJUNTIVE RELIEF AND DAMAGES

## INTRODUCTION AND NATURE OF THE ACTION

1.      Liberty's blitz of unfair competition marches on unabated. Apparently undeterred after having been sued thrice by AssuredPartners in recent months for trade secrets misappropriation and abetting duty of loyalty breaches (in addition to the many other similar lawsuits Liberty has faced from other competitors in the industry in recent years), Liberty continues to implement its playbook of raiding clients and growing its business through unlawful conduct.[1] Liberty has hired no fewer than ***forty-seven*** (47) employees from AssuredPartners in the last nine months (the "Departed Employees").

---

[1] A review of dockets across the country since 2020 reveals ***no fewer than ten lawsuits*** (including this one) where Liberty has been accused of winning business through trade secret misappropriation, duty of loyalty violations, and similar claims—a huge number, given Liberty's size in the industry. *See*, *e.g.*, *AssuredPartners of California Ins. Services, LLC v. Clem*, Case No. 2:25-cv-11856 (C.D. Cal.) (filed Dec. 15, 2025); *AssuredPartners of California Ins. Services, LLC v. Pahl*, Case. No. 4:25-cv-00693 (D. Ariz.) (filed Dec. 15, 2025); *AssuredPartners of California Ins. Services, LLC v. Dann, et al*, Case No. 2:25-cv-09187 (C.D. Cal.) (filed Sept. 25, 2025); *The Hays Group, Inc. v. William Allen, et al*, Case No. 27-CV-24-3619 (Hennepin Dist. Ct. Minn.) (filed March 8, 2024) (alleging theft of trade secrets and breaches of restrictive covenants agreements to divert client business to Liberty); *Brown & Brown, Inc., et al v. The Liberty Co. Ins. Brokers, et al,* Case No. 22VECV01048 (L.A. Co. Cal. Sup. Ct.) (filed July 25, 2022) (alleging theft and improper deletion of confidential information and trade secrets by several employees to divert business to Liberty); *Seeman Holtz Property & Casualty, LLC v. Ripley*, Case No. 502022CA001534 (Palm Beach, Fla.15th Cir.) (filed Feb. 16, 2022) (alleging widespread breaches of restrictive covenants agreements and theft of confidential information to divert business to Liberty); *Corporate Ins. Advisors, LLC v. Addeo, et al*, Case No. 0-21-cv-61769 (S.D. Fla.) (filed Aug. 23, 2021) (alleging misappropriation of trade secrets and diversion of clients to Liberty in breach of employees' duty of loyalty to competitor); *Gamie, LLC v. The Liberty Co. Ins. Brokers*, *et al*, Case No. 30-2020-01161644-CU-BT-CJC (Orange Co. Cal. Sup. Ct.) (filed Sept. 23, 2020) (alleging a scheme by Liberty employees to "unfairly compete against [plaintiff] by misappropriating its trade secret customer and business information to unlawfully solicit [plaintiff's] client accounts"); *Tolman & Wiker Ins. Servs., LLC v. The Liberty Co. Ins. Brokers, Inc., et al*, Case No. 2:20-cv-08641 (C.D. Cal.) (filed Sept. 21, 2020) (alleging theft of trade secrets to solicit clients to move business to Liberty).

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

2.      Rather than require its new hires to resign from AssuredPartners, start work at Liberty, and then compete *fairly* for business—as California law requires and liberally permits—the Individual Defendants spent weeks unabashedly violating their duties of loyalty and misusing and misappropriating AssuredPartners' trade secrets and to move substantial client business to Liberty, all with Liberty's apparent encouragement and blessing. As further detailed below, these acts include:

- **Reed (Producer):** Reed repeatedly forwarded confidential client documents and compilations to his personal email account in his final weeks of employment, including a detailed compilation of new and lost client business in December 2025.

- **Fuentes (Producer):** Fuentes wasted no time in putting AssuredPartners' client relationships at risk; he started soliciting them to Liberty before he even left his job at AssuredPartners. On January 31 (before his resignation), he sent a sent a broker-of-record change letter ("BOR") to a client to transition their business to Liberty. In other words, Fuentes began soliciting client business to Liberty *before* he resigned, in violation of his duty of loyalty to AssuredPartners.

- **Awan (Producer):** Awan's conduct likewise shows pre-resignation solicitation for Liberty and the use of AssuredPartners' information to facilitate the issuance of BORs. On his first day of employment at Liberty, Awan sent an email to a client attaching BOR letters with the Policy Number, Policy Type, and Writing Company information "prefilled," indicating these letters were prepared using AssuredPartners' information (rather than information supplied by the client). Indeed, when the client responded (by replying to Awan and another colleague at their AssuredPartners' email addresses), the client seemed confused about the nature of the request, saying that "Atif from Assured partners sent me these documents for your signature."

- **Dela Torre (Account Executive):** In her final days of employment with AssuredPartners, on January 20, Dela Torre forwarded to her personal email

3

account multiple documents received from a prospective client who was seeking quotes from AssuredPartners, including the company's current policies, binders, coverage information, and a spreadsheet containing detailed property and financial information. She also forwarded that information to Fuentes internally and later sent a client-created document to Ghica-Ochoa's personal email address. These acts reflect a coordinated scheme among the Individual Defendants to move AssuredPartners information outside proper channels in anticipation of competing against AssuredPartners at Liberty.

- **Ghica-Ochoa (Director of Commercial Lines):** After leaving, Ghica-Ochoa worked with Fuentes and Dela Torre to use client account information and documents which did not originate from the client, but from AssuredPartners, to prepare renewal materials and facilitate the transition of at least one client account to Liberty. Her conduct reflects both improper retention of AssuredPartners' information before departure and subsequent use of that information to benefit Liberty.

3. On January 16, 2026, Reed resigned effective immediately.

4. On February 2, 2026, the other Individual Defendants resigned through letters from Liberty's outside counsel, Ethan Rasi. These letters falsely claimed the Individual Defendants were "constructively discharged" and "terminated" from their employment—both provably false claims. With respect to their possession of AssuredPartners' information, the Individual Defendants' letters attempted to put the onus on AssuredPartners, demanding: "In the event [Individual Defendant] is in possession of any company property, please identify said property and provide instructions as to how it should be returned."

5. The Individual Defendants' harvesting of client information, pre-resignation solicitation of clients, and false representations by Liberty-hired lawyers is a virtual carbon copy of the illegal conduct committed by several other former AssuredPartners (now Liberty) employees in other cases pending before this same

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Court: *AssuredPartners of California Insurance Services, LLC v. Clem* (the "Clem Matter") and *AssuredPartners of California Insurance Services, LLC v. Dann* (the "Dann Matter"), as well as a companion case pending in Arizona, *AssuredPartners of California Insurance Services, LLC v. Pahl* (the "Pahl Matter").[2]

6.      In those cases, various Liberty employees: (i) forwarded themselves confidential client documents to their personal email addresses before resigning; (ii) took more than 100 photographs of client information on their AssuredPartners' computer screen to use at Liberty; (iii) printed a voluminous compilation of client information shortly prior to resignation; and (iv) "laundered" client confidential information through the clients themselves by sending them "sham" emails without any legitimate reason to do so, with the clear intention of having the clients send this internal AssuredPartners work product "back" to them once they started at Liberty.

7.      These are no longer mere allegations; Liberty and its employees readily admit to their retention (and *use*) of AssuredPartners' information in the Clem and Pahl Matters to quickly and easily facilitate the transition of client business to Liberty.

8.      Meanwhile, AssuredPartners now knows Mary Pahl and Jenna Farrell exchanged dozens of text messages laying out their coordinated theft, and Pahl readily admitted at her deposition that she used the information she stole to facilitate the movement of client business from AssuredPartners to Liberty and to build out those clients' files on Liberty's systems.

9.      In other words, Liberty is abundantly aware that its previous hires from AssuredPartners have repeatedly and unabashedly committed theft and violated their duties of loyalty on their way out the door. But rather than give this latest batch of hires from the Newport Beach office explicit instructions to comply with trade secrets laws

---

[2] AssuredPartners is open to the consolidation of this case with the Clem Matter for purposes of both discovery and trial. However, to avoid further delay and disruption in the Clem Matter to AssuredPartners' efforts to complete expedited discovery and obtain relief on its request for a preliminary injunction, AssuredPartners now brings suit separately against the Individual Defendants, who worked in a different office from the Clem Matter defendants (and one with a different corporate predecessor).

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

and commit to fair competition, the Individual Defendants in this case have used the very same playbook of theft and illegal conduct.

10. Clearly, the Individual Defendants here believed they could "get away with it" without any consequences, given that not a single person in the Clem Matter, Pahl Matter, or Dann Matter has faced any consequences whatsoever for their proven misconduct. Liberty has not disciplined a single person for their proven theft; unsurprising, given that Liberty outright condones this kind of illegal misconduct.[3] And none of the Departed Employees have been held accountable in the courts (yet).

11. Importantly, California law permits and encourages *fair* competition between competitors, including by prohibiting post-employment restrictive covenants against competition. In other words, had the Individual Defendants pursued client business *after* their resignations and *without* the use of AssuredPartners' trade secrets, AssuredPartners would have had a chance to retain this diverted client business, while Liberty and the Individual Defendants would have had an opportunity to win it through their relationships and business development efforts. That is exactly what fair competition is supposed to look like.

12. The Individual Defendants and Liberty did not do that. Instead, the Individual Defendants (just like their counterparts in the Dann, Clem, and Pahl Matters) began soliciting and facilitating the transfer of substantial client business in violation of their duties of loyalty to AssuredPartners and in violation of state and federal trade secrets laws, only resigning when they were confident they could immediately move clients to Liberty starting the very same day they resigned.

13. The Defendants' actions have damaged AssuredPartners' legitimate business interests and have caused a diminution in value of its client goodwill and trade secrets. Absent an order enjoining the Defendants' wrongful conduct, AssuredPartners

---

[3] In fact, Pahl testified that no one at Liberty even asked her about AssuredPartners' allegations about her wrongful retention of confidential information when the case was filed. She was only asked months later, when her deposition was on the horizon. So much for Liberty's "commitment to highest business ethics and business practices."

6

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

faces irreparable injury, including the loss of its carefully fostered client relationships, harm to its confidential information and trade secrets, and harm to its competitive advantage in the insurance-brokerage industry.

14. AssuredPartners hereby brings this action for immediate, preliminary, and permanent injunctive relief to put a stop to the Defendants' violations and to protect AssuredPartners from irreparable harm, as well as compensatory damages, punitive damages, and attorneys' fees.

### THE PARTIES, JURISDICTION, AND VENUE

15. AssuredPartners is a California limited liability company with its principal place of business in Ventura, California. AssuredPartners has one member— AssuredPartners Capital Inc. AssuredPartners Capital, Inc. is a Delaware corporation with its principal place of business in Florida. AssuredPartners Capital, Inc. is ultimately owned by Arthur J. Gallagher & Co., a Delaware corporation.

16. Liberty is a Delaware limited liability company with its principal place of business in Woodland Hills, California. Liberty is a competitor of AssuredPartners.

17. Reed is an individual believed to reside in the State of California.

18. Fuentes is an individual believed to reside in the State of California.

19. Dela Torre is an individual believed to reside in the State of California.

20. Awan is an individual believed to reside in the State of California

21. Ghica-Ochoa is an individual believed to reside in the State of California.

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action involves a claim arising under the laws of the United States, the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1832, *et seq*. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

23. This Court has personal jurisdiction over Liberty because its principal place of business is in California and its tortious acts were committed in California.

///

///

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

24. This Court has personal jurisdiction over the Individual Defendants because they each reside in California and their tortious acts were committed in California.

25. Venue is proper in the United States District Court for the Central District of California, pursuant to 28 U.S.C. § 1391(b), because Liberty does business in this District, parts of the AssuredPartners trade secrets at issue in this Complaint reside or originated in this District, and a substantial part of the events giving rise to AssuredPartners' claims occurred in this District.

## FACTUAL BACKGROUND

### *AssuredPartners' Business and Company History*

26. AssuredPartners provides property and casualty, risk management, employee benefits, and personal insurance products and services to a variety of individuals and businesses, including businesses in the aerospace, agriculture, construction, financial services, entertainment, healthcare, hospitality, manufacturing, real estate, and transportation industries.

27. Together with its affiliates, AssuredPartners is an industry-leading provider of insurance products and services to clients located in California and throughout the nation.

28. AssuredPartners hires and trains salespersons, known as "Producers," to sell its insurance products and services to its clients. AssuredPartners rigorously screens and trains its Producers to ensure they are qualified to represent and sell its products, have the proper tools to analyze and meet client needs, and can furnish AssuredPartners' clients with tailored insurance solutions and services that satisfy its clients' unique insurance requirements.

29. Producers (such as Reed, Fuentes, and Awan) rely heavily on Account Executives and Account Managers to provide tailored insurance solutions and meet clients' day-to-day servicing needs. These employees generally work together as a team to service a client's account.

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

30. An Account Executive (such as Dela Torre) works closely with clients to prepare insurance applications, oversee the renewal process, and serve as a liaison between the client, insurance carrier, and the AssuredPartners servicing team.

31. An Account Manager provides day-to-day servicing support on client accounts. This includes maintaining policyholder files, inputting data, issuing certificates of insurance, and assisting the Producer and Account Executive in responding to various client inquiries.

32. AssuredPartners expends substantial resources advertising, marketing, and promoting its insurance products and services, as well as paying employees to network with potential and active clients and cultivate and maintain its business relationships. These expenditures include, among other things, marketing materials, marketing events, networking expenses, and on-and-off-site client events.

33. AssuredPartners also maintains and provides employees with access to its confidential information and trade secrets, which they utilize in servicing, quoting, renewing, and developing their client relationships on behalf of AssuredPartners.

34. The training that AssuredPartners provides, the confidential information and trade secrets belonging to AssuredPartners, and its substantial expenditures promoting its products and services enables its employees (especially its Producers and the teams they work with) to develop and cultivate loyal client accounts and relationships on behalf of AssuredPartners.

35. The loyalty that AssuredPartners' employees cultivate using AssuredPartners' resources and training drives repeat business, including policy renewals. AssuredPartners' client goodwill and confidential information provide it with its competitive advantage in the highly competitive insurance industry.

***Protection of AssuredPartners' Confidential Information***

36. AssuredPartners' clients entrust it to safeguard and protect their private information, which includes information relating to, among other things, personal data, dates of birth, social security numbers, types of policies, amounts of insurance, risk

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

information, premium amounts, and other confidential business information and sensitive personal information regarding their employees—from unauthorized use or disclosure.

37. AssuredPartners also maintains and develops several forms of confidential information that gives AssuredPartners a competitive and economic advantage over its competitors as a result of not being publicly available or accessible to AssuredPartners' competitors. Some examples of AssuredPartners' confidential information include confidential client and prospective client contact information, acquisition targets, vendor information, insurance carriers, policy forms, rating information, expiration dates, contracts or arrangements with third parties, financial information, marketing plans, business plans, operations, pricing, promotions, business strategies and methods, and the specific services and products offered by AssuredPartners to its clients or prospective clients.

38. AssuredPartners protects the confidential information described above by, among other things: limiting the disclosure and use of this information to those who have specific specialties and experience; educating its employees about the requirements and necessity of keeping this information confidential; restricting access to its computer networks and requiring the use of passwords to access the information; and requiring employees to execute written agreements that protect against the misuse and improper disclosure of confidential information.

39. Producers, Account Executives, Account Managers, or other employees would not have access to this confidential information prior to entering into his or her relationship with AssuredPartners, and they are only allowed access to this information on a need-to-know basis, as part of their employment responsibilities.

40. Hence, AssuredPartners' confidential information is not available to the general public and is closely guarded by AssuredPartners. AssuredPartners keeps such information strictly confidential in order to protect its clients' privacy and to maintain a competitive advantage in the highly competitive insurance business. The time,

10

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

expense, and effort that has gone into the development and protection of AssuredPartners' confidential information is substantial. The independent development of identical or comparable materials by competitors of AssuredPartners would be extraordinarily difficult and expensive.

41.     As such, certain of AssuredPartners' confidential information constitutes trade secrets under California and federal laws, including compilations of valuable client information and internal work product.

### The Individual Defendants' Employment With AssuredPartners

42.     Fuentes was a Producer in AssuredPartners' Newport Beach office who worked for AssuredPartners (and its predecessor) for 34 years.

43.     Reed was a Sales Executive in AssuredPartners' Santa Ana office who joined AssuredPartners in 2020 after AssuredPartners acquired his business, Reed Surety & Insurance Services, Inc.

44.     Dela Torre was an Account Executive in AssuredPartners' Newport Beach office who joined AssuredPartners' predecessor (Tutton Insurance) in 2011. She was part of Fuentes' servicing team.

45.     Awan was a Producer in AssuredPartners' Newport Beach office who joined AssuredPartners' predecessor (Tutton Insurance) in 2019.

46.     Ghica-Ochoa was a Director of Commercial Lines in AssuredPartners' Newport Beach office who worked for AssuredPartners (and its predecessor) beginning in 1999. She worked closely with Fuentes to service clients he was responsible for servicing as Producer.

### Liberty's Aggressive Raid of AssuredPartners' Employees, Clients, and Confidential Information Leading Up to This Lawsuit

47.     The Individual Defendants were part of yet another raid by Liberty in its ongoing efforts to compete unfairly and obtain AssuredPartners' confidential and trade secret information through Departed Employees. In less than nine months, the number of Departed Employees has grown to nearly fifty.

11

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

48. In May 2025, Connor Dann, a Sales Executive at AssuredPartners, resigned and joined Liberty. In the wake of his resignation, AssuredPartners discovered Connor's misappropriation of AssuredPartners' confidential information and trade secrets, including through his use of a cloud storage account and personal email account.

49. During the Summer of 2025, AssuredPartners discovered that Producer Jeff Dann (Connor's father) had been materially assisting Connor at Liberty, including by forwarding confidential information to Connor and diverting at least one client from AssuredPartners to Liberty. Upon discovering his disloyalty and misappropriation, AssuredPartners terminated Jeff's employment on September 22, 2025. Jeff later joined Connor at Liberty.

50. A few months later, on November 17, 2025, nine of the employees in AssuredPartners' Ventura office abruptly resigned without notice: Ray Clem, Mark Lyon, Kip Keller, Jenna Farrell, Greg Smith, Jodie Doner, Joyce Schoonmaker, Lisa Woolley, and Mary Pahl. Each of these Departed Employees resigned in a boilerplate letter sent by Liberty's outside counsel, Lou Shoch.

51. Each of the Ventura Departed Employees immediately went to work at Liberty. Upon information and belief, each of them had their Liberty-issued work computers and user credentials set up and "in use" prior to the time of their resignations.

52. Within mere hours (*i.e.*, later in the day on November 17), and over the next several days and weeks, AssuredPartners began receiving BOR change notifications from carriers for the clients serviced by the Ventura team. These include many of the very same clients about which Clem, Pahl, and Farrell misused and misappropriated confidential information and apparently began soliciting and diverting before their resignations.

53. On November 18, 2025, eight more AssuredPartners abruptly resigned without notice, this time from the Bakersfield office: Shaun Kelly, John Ansolabehere, Veronica Milam, Kim Aguilar, Xochitl Rodarte, Jessica Alalas, and Donna Ong. Each

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

of these Departed Employees resigned in a boilerplate letter sent by Liberty's outside counsel, Eric George.

54. Each of the Bakersfield Departed Employees immediately went to work at Liberty. Upon information and belief, each of them had their Liberty-issued work computers and user credentials set up and "in use" prior to the time of their resignations.

55. AssuredPartners began to receive a flood of BOR notifications from clients serviced by the Bakersfield Departed Employees almost immediately after their resignations.

56. On December 1, 2025, seven employees in AssuredPartners' Santa Maria office abruptly resigned without notice: Joan Kirchhof, Ron Cossa, Julieta Fosdick, Vanessa Rodriguez, Elizabeth Gonzalez, Teri Gonzales, and Daisy Cruz. Each of these Departed Employees resigned in a boilerplate letter sent by Liberty's outside counsel, Ethan Rasi.

57. Each of the Santa Maria Departed Employees immediately went to work at Liberty. Upon information and belief, each of them had their Liberty-issued work computers and user credentials set up and "in use" prior to the time of their resignations.

58. On December 15, four more AssuredPartners employees in its Ventura officed resigned, again through outside counsel, Ethan Rasi.

59. Even prior to this most recent departure from the Newport Beach office, AssuredPartners has lost many millions of dollars in client business through Liberty's raiding, much of which has occurred through pre-resignation solicitations and breaches of the duty of loyalty and outright theft of information. As such, AssuredPartners has filed similar claims against various Departed Employees in the Dann Matter, Clem Matter, and Pahl Matter, which have included requests for injunctive relief.

60. Unfortunately, AssuredPartners' prior litigation efforts have not changed Liberty's course of action. Clearly, Liberty has no intention of "playing by the rules" and competing fairly in the marketplace; it will require Court intervention to do so.

///

13

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

*The Individual Defendants' Abrupt Resignations*

61. On January 16, 2026, Reed resigned effectively immediately. After learning that Reed had taken AssuredPartners' confidential information, AssuredPartners sent him a cease-and-desist letter reminding him of his ongoing confidentiality obligations.

62. On March 4, 2026, Liberty's outside counsel responded on Reed's behalf, claiming that Reed was complying with his obligations. Prior to that letter, AssuredPartners was unaware that Reed had joined liberty.

63. Meanwhile, on February 2, 2026, Fuentes, Awan, Dela Torre, and Ghica-Ochoa "resigned" effective the same day via letters sent by Liberty-hired counsel.

64. In their "resignation" letters, Fuentes and Awan falsely claimed they were "terminated" on January 31, 2026. That is categorically and demonstrably false. Rather, as part of AssuredPartners' ongoing integration with its new parent company, Arthur J Gallagher & Co., AssuredPartners required each employee to sign a new confidentiality agreement. As of January 30, 2026, Fuentes and Awan had refused to do so.

65. Because AssuredPartners was committed to working through these employees' concerns and retaining them with the company, it agreed to extend its prior January 31 deadline to continue working through these agreements.

66. Via both email and text message on Friday, January 30, AssuredPartners made it clear to Fuentes and Awan that they were not fired, they were still employed by AssuredPartners, and AssuredPartners wanted to work through the agreements.

67. Despite this, at "open of business" on Monday, February 2, Fuentes and Awan proceeded to falsely claim they were "terminated" on January 31 in a letter written by Liberty's attorneys. Liberty then claimed that the servicing employees supporting Fuentes and Awan (including Ghica-Ochoa and Iris De La Torre) were "constructive[ly] discharge[d]" by virtue of the terminations of Fuentes and Awan.

68. AssuredPartners promptly responded to "correct the record": these employees were not terminated, and they knew as of the time of their February 2 letters

14

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

that they were not terminated. Regardless, AssuredPartners accepted their resignations, effective as of their letter on February 2, 2026.

69.    Each of the Individual Defendants immediately went to work at Liberty. Upon information and belief, each of them had their Liberty-issued work computers and user credentials set up and "in use" prior to the time of their resignations, allowing them to immediately start working the day of their resignations.

70.    Just like with the Ventura, Santa Maria, and Bakersfield resignations, AssuredPartners began to receive BOR notifications for clients serviced by the Newport Beach Departed Employees almost immediately.

71.    The timing of the BORs and broker change notifications in relation to these Departed Employee departures is *highly* incriminating evidence that the Individual Defendants began soliciting clients prior to their resignations and used AssuredPartners' confidential information to do so.

72.    In a scenario where a client is lawfully solicited and decides to move its business to a new brokerage only *after* a Producer resigns from their old brokerage, the process of moving the client's business necessarily takes some time. First, the client must be informed of the Producer's new employment and "sold" on the idea of switching brokers. Second, the client must provide the Producer with information necessary to prepare a BOR letter. Third, the broker must prepare the BOR letter and have it executed by the client. Fourth, the broker must send the executed BOR letter to the carrier for processing. And fifth, the carrier must receive the BOR and send it to the old broker as notice, which does not always happen the same day (or even the same week) the BOR letter is received by the carrier.  It is therefore entirely implausible that these steps could be accomplished *lawfully* within a matter of hours (or even within a day or two).

73.    Rather, the only way the Individual Defendants could have accomplished this blitz of client movement within such a short period of time is if they had already

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

solicited the clients before resignation and/or used AssuredPartners' confidential information and work product to facilitate the BOR process.

### *The Individual Defendants' Theft and Disloyalty Prior to Resignation*

74.    Following the Individual Defendants' resignations, AssuredPartners imaged their work-issued laptops and, with the assistance of a third-party forensic consultant, began an investigation of their computer and email activity in their final weeks of employment. This investigation is ongoing, but it has thus far revealed highly incriminating evidence of the Individual Defendants' misconduct. A brief summary of the known evidence as to each Individual Defendant is summarized below.[4]

*Kevin Reed*

75.    On December 30, 2025, Reed sent to his personal email a spreadsheet entitled "Dec 2025 New Lost Report." The report summarized new and lost business for December across Newport Beach Producers and contained a compilation of confidential client information, including client names, lines of coverage, policy numbers, carriers, effective dates, and revenue. The report also identified business lost or gained by other Producers, including Fuentes and Awan.

*Ray Fuentes, Alexandra Ghica-Ochoa, and Iris Dela Torre*

76.    On January 31, days before his employment with AssuredPartners was terminated, Fuentes sent an email from his personal email account to an AssuredPartners client enclosing a Broker of Record change letter ("BOR"), writing:

///

///

///

///

///

///

---

[4] AssuredPartners is continuing to investigate forensics and conduct discovery into the nearly 50 Departed Employees who left AssuredPartners for Liberty. Additional individuals may be added to the case as it proceeds.

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Per our conversation, I am happy to announce that I have moved to The Liberty Company Insurance Brokers agency.

As requested, I have attached a Broker of Record letter to move your account to my new agency.
If you would please copy the attached letter onto your letterhead, sign, and email back to Ray.Fuentes@libertycompany.com

Please email back the signed forms for work comp and package as well.

Look forward to a continued working relationship!

77.     On February 2, Fuentes' resignation date and first day at Liberty, the client responded by emailing Fuentes at his AssuredPartners email address and asking about the BOR letter. Shortly after, AssuredPartners received notice of a BOR for the account.

78.     Based on the timing and content of these communications, Fuentes solicited and began the process of diverting at least one AssuredPartners client account to Liberty even before his resignation, in clear violation of his duty of loyalty to AssuredPartners.

79.     On January 28, 2026, shortly before her departure, Ghica-Ochoa deleted the Google Chrome history from her AssuredPartners-issued computer.

80.     The Individuals Defendants subsequently used AssuredPartners' information in their possession to facilitate the transition of client accounts to Liberty. On February 13, 2026, Fuentes emailed a number of documents to Dela Torre and Ghica-Ochoa at their Liberty email addresses and provided instructions regarding BOR letters and related account documents for a client, stating, "Our B of R's are 2nd and 3 page. Binders attached. Auto policy. Certificate." The documents referenced in the email thread do not appear to have been transmitted by the client and instead appear to have originated internally from the Individual Defendants via AssuredPartners.

81.     On February 17, 2026, Ghica-Ochoa emailed multiple Liberty employees attaching certificates of insurance and instructing them to enter the information into the

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

"GL master certificate shell" she had created for this client. A few days later, one Liberty employee sent the client renewal certificates and applicable endorsements.

82. In response, the client emailed Fuentes and Ghica-Ochoa at their AssuredPartners' email addresses, asking, "Hello Ray, what are these documents for? Are there any changes to our existing policies? Am I going to get a new contract for 2025-2026 under the new agency?"

83. This exchange demonstrates that Fuentes, Dela Torre, and Ghica-Ochoa used client documents and account information obtained through their work at AssuredPartners to prepare renewal materials and facilitate the transition of the client's account to Liberty. Upon information and belief, the client did not provide these documents in the thread and appeared unaware and confused that its account was being moved to a "new agency."

84. On January 20, 2026, Dela Torre forwarded to her personal email account an email thread involving a prospective client seeking an insurance quote. The email contained the prospective clients' current policies and quotes for multiple properties, including insurance binders, policies, and coverage information. The email also included a spreadsheet detailing the properties' locations, market rent, management fees, and ownership information. Dela Torre then forwarded this information to Fuentes' work email address, making him aware of the prospective client and the information obtained from that client.

*Atif Awan*

85. On February 2, 2026, Awan's first day at Liberty, Awan contacted an AssuredPartners client from his Liberty email account and asked the client to sign and return multiple BORs. Awan copied another Departed Employee at her Liberty email address, Karla Verken-Balogh. The BOR letters were "pre-filled," and there is no evidence that the client provided this information to Awan after joining Liberty to allow for the preparation of these letters.

///

18

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

86.   In fact, it appears the client was not even aware of what they were reviewing in Awan's email. The client responded by copying Awan and Verken-Balough at their AssuredPartners email addresses, stating "Atif [Awan] from Assured partners sent me these documents for your signature."

87.   The timing of these events demonstrates that Awan solicited and initiated the transfer of at least one (and likely more) of AssuredPartners' clients to Liberty while still employed by AssuredPartners and/or through use of AssuredPartners' information to facilitate the issuance of the BOR letter.

## FIRST CLAIM FOR RELIEF

### Violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

### (Reed, Ghica-Ochoa, Dela Torre, Awan, Liberty)

88.   AssuredPartners incorporates the foregoing allegations as if set forth fully herein.

89.   Reed, Ghica-Ochoa, Dela Torre, Awan, and Liberty have misappropriated AssuredPartners' confidential information and trade secrets.

90.   Through these Individual Defendants' conduct, Liberty has gained access to AssuredPartners confidential lists of AssuredPartners' confidential client materials and internal work product to assist it in pitching to these clients and facilitating a streamlined process to move business from AssuredPartners to Liberty.

91.   This information is not available to the general public and is closely guarded by AssuredPartners. AssuredPartners keeps such information strictly confidential in order to protect its clients' privacy and to maintain an advantage in the highly competitive insurance business.

92.   The confidential information described above constitute protectable trade secrets under the federal DTSA, because AssuredPartners derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain

19

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839.

93. Reed, Ghica-Ochoa, Dela Torre, Awan and Liberty misappropriated AssuredPartners' trade secrets. In particular, these Defendants harvested and misused AssuredPartners' client information and work product prior to their resignations, and they have retained such information after their employment with AssuredPartners terminated.

94. Defendants have used (and continue to use) these stolen trade secrets to improperly solicit and transition the business of AssuredPartners clients and to unfairly compete against AssuredPartners.

95. Pursuant to 18 U.S.C. § 1836(3), this Court may grant injunctive relief to prevent any actual or threatened misappropriation of trade secrets.

96. Reed, Ghica-Ochoa, Dela Torre, Awan, and Liberty's illegal and wrongful retention and use of AssuredPartners trade secrets without AssuredPartners' permission constitutes actual and threatened misuse of AssuredPartners' trade secrets. Injunctive relief is therefore appropriate.

97. Accordingly, AssuredPartners requests the Court issue preliminary and permanent injunctive relief against Defendants, and anyone acting in active concert or participation with them, to protect AssuredPartners' trade secrets.

98. AssuredPartners also requests an order requiring Liberty to return AssuredPartners' trade secrets, as provided by 18 U.S.C. § 1836(3)(A)(ii).

99. AssuredPartners further requests an award of compensatory damages under 18 U.S.C. § 1836(3)(B), exemplary damages under 18 U.S.C. § 1836(3)(C), and reasonable attorneys' fees under 18 U.S. C. § 1836(b)(3)(D) because Defendants' misappropriation of AssuredPartners trade secrets was and is willful and malicious.

///

///

///

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

## SECOND CLAIM FOR RELIEF

### Violation of California Uniform Trade Secrets Act

### Cal. Civ. Code § 3426, *et seq.*

### (Reed, Ghica-Ochoa, Dela Torre, Awan, Liberty)

100.   AssuredPartners repeats and re-alleges the foregoing allegations as if set forth fully herein.

101.   AssuredPartners confidential information is considered a trade secret under the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 through § 3426.11 ("CUTSA") because AssuredPartners derives independent economic value from this information, the information is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

102. Reed, Ghica-Ochoa, Dela Torre, Awan, and Liberty have misappropriated AssuredPartners' confidential information and trade secrets through the acts alleged herein.

103.   Through these Individual Defendants' conduct, Liberty has gained access to AssuredPartners' confidential client materials to assist it in pitching to these clients and facilitating a streamlined process to move business from AssuredPartners to Liberty.

104.   This information is not available to the general public and is closely guarded by AssuredPartners. AssuredPartners keeps such information strictly confidential in order to protect its clients' privacy and to maintain a competitive advantage in the highly competitive insurance business.

105.   The confidential information described constitute protectable trade secrets under the CUTSA, because AssuredPartners derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

106. Reed, Ghica-Ochoa, Dela Torre, Awan, and Liberty misappropriated AssuredPartners' trade secrets. In particular, these Defendants harvested and misused AssuredPartners' confidential client information, and they have retained such information after their employment with AssuredPartners terminated.

107. These Defendants have used (and continue to use) these stolen trade secrets to improperly solicit and transition the business of AssuredPartners' clients and to unfairly compete against AssuredPartners.

108. Pursuant to the CUTSA, this Court may grant injunctive relief to prevent any actual or threatened misappropriation of trade secrets.

109. These Defendants' illegal and wrongful retention and use of AssuredPartners' trade secrets without AssuredPartners' permission constitutes actual and threatened misuse of AssuredPartners' trade secrets. Injunctive relief is therefore appropriate.

110. Accordingly, AssuredPartners requests the Court issue preliminary and permanent injunctive relief against the Defendants, and anyone acting in active concert or participation with them, to protect AssuredPartners' trade secrets.

111. Reed, Ghica-Ochoa, Dela Torre, Awan, and Liberty's misappropriation has resulted in unjust enrichment to these Defendants and damages to AssuredPartners in an amount to be proven at trial. Further, based on Defendants' outrageous and intentional misappropriation, AssuredPartners is entitled to punitive damages and attorneys' fees.

## THIRD CLAIM FOR RELIEF

### Breach of the Duty of Loyalty

### (All Individual Defendants)

112. AssuredPartners repeats and re-alleges the foregoing allegations as if set forth fully herein.

22

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

113.    As employees of AssuredPartners in a position of trust and confidence, the Individual Defendants owed AssuredPartners a duty of undivided loyalty.

114.    This duty required the Individual Defendants to, among other things: (i) refrain from directly competing with AssuredPartners while employed; (ii) not usurp or divert corporate opportunities for the benefit of a competitor; and (iii) protect AssuredPartners' confidential information and trade secrets from unauthorized possession, use, or disclosure.

115.    The Individual Defendants violated their duties of loyalty by, among other things: (i) competing with AssuredPartners while they remained employed by the company; (ii) soliciting, diverting, and facilitating clients to move their business from AssuredPartners to Liberty; and (iii) improperly retaining, disclosing, and misusing AssuredPartners' confidential information, trade secrets, and internal work product for their own benefit and for their subsequent use at Liberty.

116.    As a result of these breaches, AssuredPartners has been damaged in an amount to be proven at trial. Further, the Individual Defendants are obligated to disgorge any compensation earned following their breach and disgorge any ill-gotten gains obtained as a result thereof.

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Breach of the Duty of Loyalty

### (Liberty)

117.    AssuredPartners repeats and re-alleges the foregoing allegations as if set forth fully herein.

118.    Liberty was aware the Individual Defendants were employed by AssuredPartners. It was therefore aware the Individual Defendants owed AssuredPartners the duties of loyalty outlined herein.

119.    The Individual Defendants breached their duties of loyalty through the acts alleged herein.

///

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

120. Liberty materially assisted, permitted, and encouraged the Individual Defendants to breach their duties of loyalty.

121. The Individual Defendants' breaches were done for Liberty's benefit, and Liberty in fact did benefit from such breaches.

122. As a result of these breaches, AssuredPartners has been damaged in an amount to be proven at trial, and Liberty is obligated to disgorge any ill-gotten gains obtained as a result thereof.

## FIFTH CLAIM FOR RELIEF

### Civil Conspiracy

### (All Defendants)

123. AssuredPartners repeats and re-alleges the foregoing allegations as if set forth fully herein.

124. As alleged herein, each of the Individual Defendants, with Liberty's knowledge, assistance, and encouragement, has engaged in unlawful acts and/or committed lawful acts for an unlawful purpose.

125. Upon information and belief, Defendants agreed to commit such unlawful acts and/or to pursue such unlawful purposes for their own benefit and for the benefit of Liberty.

126. Defendants, individually and collectively, committed overt acts in furtherance of their agreement.

127. Defendants have therefore committed conspiracy, making each of the Defendants jointly and severally liable for damages stemming therefrom.

128. As a result of Defendants' conspiracy, AssuredPartners has been damaged in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff AssuredPartners of California Insurance Services, LLC respectfully requests the Court:

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

A.    Enter a preliminary and permanent injunction against Defendants Reed, Ghica-Ochoa, Dela Torre, Fuentes, Awan, and The Liberty Company Insurance Brokers, LLC:

   i.    Enjoining Defendants and anyone acting in active concert or participation with them, from possessing, using, and/or disclosing any AssuredPartners confidential information or trade secrets;

   ii.    Requiring Defendants, and anyone acting in active concert or participation with them, to immediately return any AssuredPartners confidential information or trade secrets in their possession, custody, or control;

   iii.    Implementing a forensic investigation protocol requiring Defendants, and anyone acting in active concert or participation with them, to provide independent forensic verification that they no longer have AssuredPartners confidential information or trade secrets in their possession, custody or control, including by providing access to and cooperation with a third-party forensic consultant to image, inspect, and remediate any devices or accounts containing AssuredPartners' trade secrets and confidential information;

   iv.    Requiring Defendants, and anyone acting in active concert or participation with them, to affirm under oath that they have returned, and no longer possess or have access to, any AssuredPartners confidential information or trade secrets, for a period of time the Court determines is reasonable;

   v.    Enjoining Defendants from soliciting or otherwise interfering with AssuredPartners' relationships with any client of AssuredPartners that is still doing business with AssuredPartners which the Individual Defendants had material involvement with at AssuredPartners or received any confidential information or trade secrets about at AssuredPartners, for a period the Court determines is reasonable and necessary to protect AssuredPartners based upon the Individual Defendants' misappropriation; and

   vi.    Ordering Defendants to preserve, and not to delete, destroy, erase, modify, duplicate, or forward, any potentially relevant

25

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

devices, documents, communications, electronically stored information, or metadata.

B.    Enter judgment in AssuredPartners' favor and against Defendants;

C.    Award compensatory, exemplary, punitive, and nominal damages against Defendants;

D.    Award AssuredPartners its reasonable costs and attorneys' fees incurred in this action; and

E.    Award AssuredPartners all other just and proper relief.

Respectfully submitted,

DATED: March 17, 2026

/s/ *Hailey A. Tull*
Vince M. Verde
Hailey A. Tull
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Park Tower, Fifteenth Floor
695 Town Center Drive
Costa Mesa, CA 92626
Telephone:  714.800.7900
Facsimile:   714.754.1298

/s/ *Justin A. Allen*
Justin A. Allen (pro hac vice forthcoming)
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
300 N. Meridian St., Suite 2700
Indianapolis, IN 46204
Telephone:  317.913.2533

Attorneys for Plaintiff
AssuredPartners of California Insurance Brokers, LLC

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES